I'm Ellen Durkee from the United States Department of Justice. I represent the federal defendants. Council for the Tribes and I plan to equally divide 16 minutes of the appellant's time and attempt to save 4 minutes for rebuttal. I will address the interpretation of Native American and the Native American Grace Protection Repatriation Act and the Tribes Council will focus on other issues raised by the tribal claimants. Well, do I understand that the United States appeals the holding about what is a Native American or who is a Native American, what a Native American remains, but the United States does not appeal the cultural affiliation ruling? That is correct. We appealed on the former issue. So does the United States take no position on that? As I understood your brief, you were saying you didn't appeal that part, but you want us to say these are Native American remains and, therefore, Section 3B would be applicable in some committee process with the Secretary of Interior to later determine what to do with them. But did I misread that? What we're saying is if the court finds they're Native American but not culturally affiliated, then that would be the process that you would look for. I understand that. What I'm trying to understand is does the United States of America take position on whether the evidence in this record shows sufficient cultural affiliation to give custody of the remains to the affiliated tribes? Essentially, I think we take no position on that. We were willing to acquiesce in the district court decision, taking into account the kind of factors we take into account and whether to appeal particular issues. At the same time, if this court concludes and upholds that part of the Secretary's decision and, therefore, agrees with the tribes in this case, we will certainly acquiesce in this court's decision on that. The focal point of this case is what federal law governs the handling and disposition of the approximately 9,000-year-old human skeletal remains that eroded out of an embankment and then were found widely scattered in submerged federal land. The lower court set aside the Secretary of the Interior's determination that the remains are Native American within the meaning of NAGPRA. In so holding, the magistrate judge misconstrued the statute. Read in context of the statute as a whole, the definition of Native American does not, as the magistrate judge held, require a demonstrable evidence that the remains have a cultural relationship to presently existing Indians in order to be treated as Native American under the statute. Counsel, how far does your argument go? And I want to give you a hypothetical, and it will help me understand where you draw the line. Let's assume that remains were found in what is now the United States that are the oldest possible remains, like the kind that had been found in Africa and it's clear that these remains really are Adam and Eve, essentially, that they are the source of all of us. They're so old. Would those remains count as Native American under the definition promulgated by the Secretary? And if not, where is the line drawn in your view? Okay. Taking the facts, if you're hypothetical, that we could determine conclusively that these are, you know, the origin of all humanity, then yes, they would be Native American because certainly they would be indigenous to the United States. I think that they... And what is the answer to Judge Graber's question? Yes, I'm sorry. The answer is yes, they would be considered Native American. I'll say, would we have remains that were 150,000 years old if the early Homo sapiens goes back that far, and if they were found anywhere in the continental United States, then the United States' position is those are Native American remains. Is that correct? Just a yes or no, is that correct? It would depend on the contextual, all the contextual information, and you've only given me the information as to the age. And I would like to clarify that what Interior's approach to this is and what was done in this case. Interior's approach... The magistrate judge and the appellees have... Before you proceed that, I don't understand. When you answered yes to Judge Graber's question and no to Judge Gould's question, and all the difference was one was from the beginning of time and one was for 150,000 years, it didn't follow you. I thought that the distinction being made here was that in Judge Graber's hypothetical, if it's the origin of all people, then you don't have a question of migration or visitation, which is what I thought one of the concerns of the magistrate judge was, that in terms of his focus on indigenous, that sometimes, you know, are we going to count early migrations of people as indigenous to the United States? And Interior's position is yes. In Judge Gould's example, I guess I wasn't seeing... It wasn't clear to me just from the age alone whether there was any question about the context to suggest that perhaps this was, you know... Excuse me one second. There's a rather distracting noise, and I don't know what it is, but if it can be made quieter voluntarily, that would be helpful. I won't count this against your time. I don't know. Is it the recording device that's doing that? I'm sorry. It's just hard for me to process all the different sounds at the same time. So I guess my question, I'm not assuming that one could look at human remains anywhere in the world and say they're Adam and Eve or, you know, the original progenitor of species. That's more a metaphysical question that's outside my pay scale and expertise. But assuming that, which may not be a correct assumption, but assuming that our species didn't simultaneously spring up in every continent in the world, then there's probably some migration at some point of hominids or homo sapiens that get to a place. And my question really was aimed at is there any limit on time or any limit on time in relationship to current tribes that the government recognizes that relates to what's Native American? I realize the definition from the secretary says that if you go back to something before European, before documented visits by Europeans to the continent, that people who lived here are Native American. And my question is, is there any limit to that? Would that go back 150,000 years if people lived here 150,000 years ago? Yes, it would have. Presumably you wouldn't have any other information that would be discernible about migration. I guess I would also like to make another distinction between the hypotheticals as I understood them and the Adam and Eve hypothetical. I understood that we were all biologically then related to this origin. So that might be a factor. But let me return to what I just want to be clear about. In the hypothetical, there might be no biological relationship and probably isn't any discernible biological relationship. I'd like to just clarify what interior approach is because I think it's relevant to what we're talking about here. What interior does, it primarily relies on chronological age. However, it looks at all the information that it can in the context and makes a reasoned determination based on all the information available to it. It is reasonable to presume that remains that are found buried in the United States relate to an indigenous culture if they precede European exploration. But in this case and in the context in which we're talking about, that's not the only thing interior looked at and that's not the only thing they're suggesting that be looked at. You look at the entire context. And here with these remains, the contextual clues were fairly limited because the remains were disassociated from where they'd been buried and there were no artifacts to go with them as there sometimes are to give you clues. Isn't that partly like a problem caused by the federal government, Army Corps of Engineers or whatever, sweeping rocks into the discovery sites so there couldn't be other review? Oh no, Your Honor. What happened here is that these remains were in an embankment. And the reason that when it eroded away, and then they were scattered in the Columbia River. So when they were found by the initial spectator, they were not where they'd initially been buried. And as they collected them over this widely dispersed area, they found that it was a total skeleton. But the place where they were found is not, when I'm saying the burial area, it's not where they believed it was actually buried. That area's eroded away. And in terms of what the Corps did here, what they were trying to do was, there's an eroded area where this had sort of swept into the river there. And then there's a tear that goes up an embankment and there's an undisturbed terrace area. And what they were trying to do was to armor that so that the erosion didn't continue inward from that. And so they were actually trying to protect the area. I understand they had reasons for what they were doing. But the result of what they did may make it, for good reason, difficult to get all potential information available that might bear on the remains. Again, to the contrary, Your Honor. I think a great deal of examination was done of that area before any kind of armoring was done. And these artifacts or whatever were not found. And given the erosion, it was in the view that, this isn't really part of the case, but in terms of that particular legal issue, I think it's important to say that the State Historic Preservation Act officer had signed off on it. The Advisory Council had signed off on it. I guess I'm still interested in the government's precise position on interiors regulation and what it means. Because literally it would seem to have no time limit, that is, which might be the correct position or not. That's one of the things I'm trying to assess. But am I correct that under the interiors regulation, if some early homo sapiens lived in North America, any distance in time from the present, that you would view those as Native American remains? I mean, they're not like a traveler from Europe visiting on a vacation. Let's say they lived for hundreds of years somewhere in North America, but they're not necessarily biologically related and they're certainly not culturally related to anything 100,000 years later. Is it the government's position that Congress intended those types of remains, which might be like what Judge Graber's referring to in Africa that have been found, are those types of remains to be viewed as Native American remains and therefore subject to Section 3B procedure, I guess, if there's no cultural affiliation? To answer your question, there is no time cutoff that interior has in terms of how far back you could go to be Native American. Do you think Congress had? When Congress passed the statute to protect Native American graves and to repatriate things taken from them, do you think Congress would have had any limit at all in mind in time? I do not think Congress had any limit in time in mind, and I think that going back to the statute. While you're answering Judge Gould's questions, I would like you to give me the major premise and then the minor premise on how the government reaches such a conclusion. Okay, I've been trying to get to that. The major premise is this. The statute sets up a two-step process. The first one is a threshold determination of whether remains are Native American or Native American objects subject to the act. From that determination, certain procedures and responsibilities flow. A second and independent determination follows that goes to these issues of cultural relationship and biological relationship and so on, and that goes to whether there is a qualified claimant for disposition or repatriation. And the magistrate judges trying to somehow cut off going back in time. Yes, but my problem with your argument right there is that your major premise assumes a conclusion that all remains are Native Americans, and I think that that's an assumption. That's putting the bunny in the hat. It does not assume that all remains are Native American. Okay. I mean, certainly what we've been focused on in this case are remains that date European exploration. Obviously, remains that are from European, the non-indigenous peoples, are not covered by the act. So there is not, this is not an argument that every human remain found on federal land is Native American. If you would say any human remains, I don't mean you personally, I mean Interior says that any human remains found that predate European arrival to North America, say anything before the 16th century, is going to be viewed as Native American. I think the presumption is that it is, and if I can tell you what Interior does, is that if they can, and I'll try to say it quickly so I can get it in, if they can find from context something that would preclude that finding, the example of a European explorer or the example of an explorer, then that might be a different case. But in this case, all the evidence other than age was consistent with finding that the Kennewick Man was part of the hunter-gatherer population that is known to have been populating the United States at that time. And in that sense, that is enough to find it's Native American. It is not necessary to make the additional step that the magistrate does require, which is to show a cultural relationship to presently existing issues. Cultural affiliation comes in if it's under NAGPRA to determine who gets to take custody. Exactly. That's where it becomes relevant. But that doesn't really answer the question whether the definition of Native American as everything pre-European is what Congress intended when they passed the statute. Is there anything in the legislative history that would suggest that Congress intended us to consider as Native American remains that were 100,000 years old, let's say, if such were found? Well, I think there's... Let me point you to three things from the legislative history, or two from the legislative history and one other thing. One of the most... Congress was advised at the hearings and was fully aware that indeed many, if not the majority, of remains would be unaffiliated. And according to the dialogue panel, whose recommendations it heavily relied upon, they called those materials that are not culturally identified with any present-day tribal group. So then Congress has provisions of the Act that talk about culturally unidentifiable remains. And so I would first point to the provisions and the legislative history to say that Congress was fully aware that it was bringing into the Act things that could not be tied to present-day Indians. Secondly, in the legislative history, the initial drafting of this bill defined Native American as simply as, quote, an Indian, Alaska Native, or Native Hawaiian. In other words, would be defined by present-day concepts or modern concepts of Indians. And Congress discarded that definition and substituted the broader definition that ultimately enacted. And I submit that the magistrate judge's interpretation effectively revised that. And finally, I would point to... Well, really, not exactly. It's arguable, perhaps, but what the magistrate judge seemed to do was to focus on the language saying that, you know, a tribe or group that is indigenous, and he gave a literal reading to the word is. And whether that's right or wrong, we have to grapple with that. The government's position depends what is is? I think I've heard that before. I mean, isn't that really what the magistrate judge did? He said he was going to read the is language literally as present tense, and he has some other statutory language that supports that, and there's some other arguments that oppose that. Well, that's his textual basis for his decision. But I think as we've said out in the breeze, I don't think the word that is can support that kind of plain language determination because the word is particularly used in describing equality like indigenous. It doesn't really have these differentiated meanings, temporal meanings in this context. And then I think you look at the rest of the statute, and it simply doesn't make sense. And that's part of plain language analysis is to look at the statute as a whole and the structure. Trustee, you had a third point. If you make that, and then we'll give you a co-counsel's time. It's in the 1997 letter that Interior pointed out that in legislation that involved the Native Hawaiian Languages Act, the Congress used the word indigenous and non-indigenous exactly as we are here, indigenous meaning pre-European exploration and non-indigenous as being post-European exploration. So that's indicative, I think, that Congress is using it as it's generally used, both in sort of international politics on it, that indigenous people are those that have preceded the colonization time period and the populated areas. And I apologize to my counsel for taking it much longer than five minutes. We'll give them some extra time. I would be happy to answer more questions, but I don't want to use more of this time. May it please the Court, I'm Robert Smith representing the Cabo tribe and speaking on behalf of the tribal appellants. And I thank the Court for the extra time to present our argument. Just briefly, I want to say that the tribes do agree with the federal appellant's interpretation of Native American, and we, too, believe that the District Court erred by ignoring that plain language and Congress's intent in passing the statute. What I want to talk about today is the District Court's interpretation of cultural affiliation. And there are really three errors that the District Court made, but I just want to limit the time that I have. On that issue, as I understand it, the government, the U.S. at least, is leaving you on your own. As I read their brief, they're not appealing on that issue, and they are saying they would not dispute if we so found. But it seems like this is going to rest entirely on your argument. It does, Your Honor. Just so that I understand, if we conclude that the remains are not Native American, we do not meet your issue. Is that right? That is correct, Your Honor. Very well. And are you sure you don't want to address that issue at all? Well, Your Honor, I saw there was quite lively questioning. There was. You know, there are a lot of issues, so it's up to you. Well, Your Honor, perhaps I will keep you up on your generous offer and respond to one of your questions that you made. One of the questions you asked about the indigenous issue. I think it's important to remember that what Congress was trying to do with the definition of Native American was using the term Native American as a term of art. They weren't trying to be politically correct, and they weren't trying to associate that with present-day tribes. Congress specifically rejected earlier drafts of the statute that used American Indian or Indian tribe in the definition of Native American. So they chose something different. And why they did that is they were looking to really right or wrong that existed at the time that NAGPRA was passed. Back in 1990, and this is at ER 51, the Senate report notes that there were between 100,000 and 200,000 Indian remains interred in museums across the country. And Congress wanted to rein in this practice. So they wanted to give NAGPRA a broad scope, and they wanted to make sure that more remains than not fell under the Native American definition. Okay, but they were focused, I think, at least as I understand the legislative history, putting aside where they ended up, they were focused on remains more proximate in time than 9,000 years old. So let me ask you the tribe's position. The tribe's position that any remains found in North America, any Homo sapien remains found in North America that are from a time before Europeans came here are Native American remains. That is, in other words, there's no requirement of a biological or cultural connection to determine what's a Native American. Your Honor, not to determine Native American. It is our position that if remains are found in the United States, or what is now the United States, that those would be considered indigenous. And I think DOI's interpretation of the statute is correct as they looked at both age and physical context. Now, in this case, we have 9,000-year-old remains, and although there is certainly scientific disagreement about this, it's generally accepted that predecessors of American Indians were first inhabitants of the United States, first inhabitants of North America. But it's not generally accepted that tribes that currently exist go back more than, say, 2,000, 3,000 years. I mean, there may be religious views that they go back to the beginning of time, but it's not generally accepted in science that these tribes have some identity going back. Well, I think that's correct. I may be correct, Your Honor, but that's why— what Congress wanted to do was just set forth a broad standard that godly remains treated under NAGPRA. So, for example, perhaps in your definition, or if we were to take a hypothetical with the Viking— I'm really not giving a definition. I'm just asking questions. Well, you know, if there is some question about whether the remains are Native American, that would get sorted out in the cultural— Well, I think that's a— —determination. I'll answer your question. There is a serious question, whether these remains are considered Native American in the context of American Indian. I think that is the real issue in this appeal. Well, Your Honor, I believe, based on the evidence before the Department of the Interior, these remains are indigenous and they are Native American, based on the fact that they are 9,000 years old and where they were found. They were found at River Mile 330 near Kennewick, Washington. So while it's certainly plausible that the ancient one could have migrated to the United States and somehow either crossed the Cascades or rode up to Columbia that far— I know you're already lights on, but I'd like to ask you this question. Going back to the statute, was there anything in the legislative history that indicated that Congress indicated that they were considering anything other than the American Indian— using that expression, American Indian as distinguished from generic Native American— as we understood it from written and oral history? Your Honor, I'm sorry. I don't quite understand your question. Could you repeat it? All right. The question is that when Congress passed the statute in question, is there any indication that they considered, under the definition Native American, anything other than what we consider the American Indian by written or oral history? No, Your Honor, there is not. Okay. I see that my time is up. If there are no further questions, I yield. Well, let—can we give them another— Sure. Maybe can you give me your perspective on this on behalf of the tribes? When I look at Section 3B, which talks about if it is a Native American remain, how do you—what priority do you dispense it in? Is it given to—to whom is it given, and what's the priority? And first would be lineal descendants, and then second would be some tribe with a cultural affiliation, or if they're a group of tribes, the ones with the closest. And then you get to the level of if there's no cultural affiliation can't be determined, there's a more complicated committee process. What bothers me about that provision from the point of view of the tribe's argument is it seems to imply that what the human remains that we're talking about, the Native American remains, are presumed to have some relationship to tribes that are making claims. If they can show they're a lineal descendant, that's the best claim. If they can't show that, show some cultural affinity. And obviously Congress was not going to require a precise affinity tribe to tribe. But at some point, if you take Judge Graber's hypothetical of going back to something like the fossils found in Africa, at some point there would be human remains that are Homo sapiens that might be found in North America. They're just—they have no proximate connection, no reasonable connection to anything living today. At least it would seem that way. And so is Congress's language in Section 3B supportive of your position or against it? That's my question. Because it seems to me that language for how you parse out where the remains go supports some limitation beyond just some persons that live in North America and North Asia. Well, Congress wanted to facilitate the return of Native American remains to tribes. And as we're going through that sliding scale of priority in 2002, from lineal descendants to closest cultural affiliation, there's a third step in there which you're on a skip, and that's the aboriginal lands provision. And that's really important to this case in the sense that it shows just the type of coverage that Congress was looking for. Because the aboriginal lands provision applies even where cultural affiliation cannot be proven by the lineal descendancy. Except that that provision, when you talk about C1, subsection C1, talks about the land—the repatriation is in the Indian tribe that is recognized as aboriginally occupying the area in which the objects were discovered. But then if you go back to the definition of Indian tribe, it appears to refer only to current Indian tribes. So would C1 even apply if there is not an existing Indian tribe that is recognized as having aboriginally occupied the area? Well, Your Honor, there would have to be a present-day tribe for the cultural affiliation section to apply at all. And certainly only—for the most part, only tribes that are currently existing brought claims to the ICC. Yes, but you were suggesting that that section demonstrated a fallacy in Judge Gould's quest to understand the meaning of this section. And I guess I don't see why C1 is inconsistent with the reading of 3002 as being—carrying with it an assumption that there would be some even minimal relationship with current-day Indians. Well, I don't think it's inconsistent, Your Honor. I think it's just a broader—it encompasses more. Because it says that—it just looks to see whether or not those remains are found on the aboriginal lands of a present-day tribe. So in that sense, it's still looking for that present-day connection. We're not talking about necessarily evidence of cultural affiliation. We're just looking purely at location and where those remains are found. And this is one of the major problems, actually, with the district court's opinion, was that he changed the appropriate language for using the aboriginal lands provision. Instead of looking at recognized aboriginal occupancy, the district court said ER203 changed that requirement to look for aboriginal title. Now, aboriginal title is a much stronger standard of proof than what Congress was intending in NAGPRA. And under the facts of this case, the claimant tribes did not exclusively use the area. But the ICC, in its findings, did find that all the claimant tribes did jointly use the area, which is why it was reasonable for DOI to rely on the ICC findings, in fact, to take advantage of the aboriginal lands provision. Well, it might be that if the remains were 2,000 years old or 1,500 years old or 1,000 years old and they're on lands that were occupied in that period that are aboriginal lands, that to apply that provision would show some relationship that was biological, if not present-day cultural. But it just seems hard to see if Congress did they really intend that, to apply to something 9,000 years old. And I'm curious, as I think Judge Albasert raised the question, if there's anything in the legislative history. that would address this question specifically. And we know Congress did not want to permit people to rob graves of Native people and to take away remains or artifacts, and that Congress thought there should be a system to get back in the hands of Native American tribes remains that were perhaps wrongfully held by museums or artifacts that were, but particularly human remains. But when you go back 9,000 years, it just raises a question in my mind whether Congress was really aiming at that. And I'm wondering if there's anything in the legislative history that sheds any light on that. Well, Your Honor, the closest thing we have to an exact answer to your question in the legislative history is the ER-41, where Congress said that it wanted NAGPRA to apply to prehistoric remains, which, in my mind, seems to indicate that they're going past just 1,000 or 2,000 years. They wanted to reach back in time. And it's also supported by other statements in legislative history on that same citation page where they talk about allowing for gaps in the record and not requiring scientific certainty. They recognize that when you get further back in time, obviously the harder it is to draw an exacting link between those older remains and present-day tribes. How is it provided for that? Let me ask a procedural question that I at least haven't figured out. Maybe others would have figured it out, or you would have it thought through, I hope. Probably you wouldn't have addressed this because you're on the other side of this first issue. But if the court were to determine that the current record did not support a conclusion that the remains found at Chinook are Native American and were to affirm the order that scientists could study the remains, what if the further study then did show a biological connection through more extensive DNA testing? I know there was some DNA testing that was inconclusive. But what if there were more extensive tests and they then showed a strong relationship to Native American people in current tribes in some genetic sense that's really beyond my expertise? But I'm sure it might be possible. What would happen procedurally then? Would the tribes be able to go in and move to reopen this? What would occur? Well, Your Honor, I believe that would be up to the Department of the Interior because once those remains, if there were to be additional studies, and if those additional studies were to show those remains are indeed Native American and closely affiliated, then I would hope that the Department of the Interior would step back in and then cease any further investigation and then begin this process of DNA which would atriate the remains to the tribes. But the problem is, there are actually two problems there in the sense that, one, if you provide these additional studies to prove that the remains are Native American, you're kind of swallowing the purposes of the statute within the studies. The idea was to foreclose unconsented study of remains. Right, which I think has to be honored in a case where it's clear that they are Native American remains, that no one's got a right to study them. But if that's a very question of issue, does that argue for permitting more study? Well, NAGPRA doesn't provide for additional study in Section 3002. The only study provision is in Section 3005, which deals with repatriations of remains that are currently in museum custody. And where the district court went too far with this remedy, and this is addressed at the end of our brief, is that they went ahead and virtually granted an ARPA permit to respond to this. And the attorneys here have never requested an ARPA permit. And ARPA permits under the language of the statute, at least the 16 U.S.C. 470cc, ARPA permits are permissive. They're not mandatory. And so it's up to the Department of the Interior to decide whether additional studies can be done if NAGPRA doesn't apply. And district court injected itself into the province of the executive by allowing a study to go forward when that decision has never been made by the Department of the Interior. So what district court should have done, and arguably district court would find these remains are not Native American, we should still vacate the remedy that the district court granted and remand the decision to the agency to determine what sort of studies could be performed. Thank you, counsel. I think we need to hear from the plaintiffs for a little bit. Thank you. Good morning. May it please the Court, my name is Paula Barron, and I, with my co-counsel, Mr. Schneider, represent the aid scientist who commenced this litigation many years ago, back in 1996, shortly after the Kennewick remains were discovered. The remains, for a short period of time, had a preliminary study, and that generated the controversy because the preliminary study suggested that they were, as they turned out to be, unlike anything that had been seen before except a very, very small handful of skeletons. We come here today to oppose the two appeals and to request that this Court affirm the decision of the United States District Court and Magistrate Judge Gelders. I wanted to start immediately with a reference to some legislative history because there had been some questions about whether or not Congress was fully focused on the issue of prehistoric remains or very ancient remains when it passed the Native American grave statute. Judge Gelders made comments about the legislative history at the first court proceedings that happened in this case in approximately October of 1996 and commented on the record that he had read the legislative history and was somewhat troubled or puzzled by how sparse it was and how it appeared to him that there was no reference to these very ancient prehistoric remains. We have also, in the answering brief on the tribes appeal, cited some comments that appear in the legislative record, and that is at page 31 of our brief, a couple of comments, and again, a very sparse legislative history. But Representative Bennett, in debates, commented that we as a nation should take care of remains for which there are no modern descendants, and Senator Okaka commented that consideration should be given to the government's role as the caretaker of peoples who are extinct. In that regard, even though it does not use the precise statutory language, that is very reminiscent of the other law that the scientists believe actually applies in this case, and that is a fairly recent statute, 1979, the Archeological Resources Protection Act, or ARPA. That's the statute that Mr. Smith referenced when he was discussing the ARPA. Counsel, it seems to me that by starting with legislative history, you're skipping over a step that is essential, and that is where we start, which is with the words of the statute. And to the extent that there is any ambiguity in the statute, that takes us not only to legislative history, but it takes us potentially to Chevron deference, to the interpretation given by the Secretary of the Interior. And I think my primary difficulty with your argument is that the statute, to me, does not seem to be crystal clear, and I know your position is that it is, and we don't get past that. Would you help me by parsing the statute and explaining why we don't get to Chevron deference, why we don't get to legislative history? Yes, of course. And you are correct that once we look at a statute and don't find an ambiguity, then we should not care what the legislative comments are. I did want to bring that up because they had been raised in questions. The statute defines Native American, and to use Chevron terms, that means that Congress has spoken. And in this particular case, Native American has a definition that says, of or relating to a tribe, people, or culture that is indigenous to the United States. Now, there are a number of components to that definition, but they certainly require something to be related or to emanate from, of or related to. Once Congress has penned a definition like that, we don't automatically move to something called Chevron deference because this Court has recognized that the Supreme Court's rulings on deference are very complicated and that, in effect, there is a sliding scale of deference accorded to administrative interpretations of a statute where it is the agency that is required to interpret and enforce that statute. What does indigenous mean, in particular, as you go through your explanation of it? I don't believe Congress defined indigenous, but nor did Interior in this particular case. And when I move into Dr. McManaman's letter, which is the Interior definition, you'll note that Interior's position in this case was that Native American is not in any way limited by the context of the concept of indigenous. Government has proposed a definition of indigenous in its briefing, which comes from a dictionary, which is probably as good as any, but it would mean something that is naturally found here, which is not imported from someplace else. In other words, not an immigrant. And one of the problems with the government's position in this case throughout has been Dr. McManaman and the Secretary eventually ignored that word entirely as though it had no meaning whatsoever and as though it was surplus in this statute. But indigenous is not something that is defined, and we are left with a statutory definition of what Congress intended Native American to be. Now, one of the things that should— Doesn't the statute say a tribe, culture, or group that is indigenous? It does. To the geographic areas the U.S. now has. What it says is, in the statute, of or relating to a tribe, people, or culture that is indigenous to the United States. The concept of the area now encompassed by was added by Dr. McManaman, but not by the informal regulation. Interior was given the authority to promulgate regulations to carry out this statute, but Congress had already defined Native American, and we submit that the first thing that should give this Court pause in considering what Interior did here is the nature of this law. I think everybody agrees, all of the parties in this courtroom agree, that when NAGPRA was passed, there was enormous debate. There were committee reports. There was testimony. There was a lot of passion, and there was a lot of compromise, because there was concern from the part of the Native American community. There was concern from the part of the scientific community and the museum community, and that resulted in what can only be viewed as a compromised piece of legislation. When something like that happens, and the Supreme Court has cautioned us repeatedly, that we have to pay some attention to the thought that Congress might not expect an administrative agency to tinker with a policy decision so lightly, and we would want to parse the statute and look for some sort of indication in the statute that suggests that Congress was passing that authority on to the Department of Interior. Well, they certainly could have. I mean, I think the only argument you have is that Congress didn't, because certainly even if your clients view this definition as going overboard, Congress had the authority to do that as a remedy for overboard exploitation on the other side. That is correct, Judge Graber, but when Congress does that, he uses very different language from what we see here. For example, there is a provision in the Federal Age Discrimination and Employment Act, which authorizes the Equal Employment Opportunity Commission to make a policy decision about whether to exempt a category of people from the protection of the statute. Now, that agency has used that rarely. It happens that they are using that provision right now. In the Securities Act, there is very broad language that authorizes the Securities and Exchange Commission to make policy decisions. So Congress surely has that authority. But it did not, we submit, exercise that authority in this statute, where they used the bold statement to carry out this statute. Okay, well, we have a pretty explicit statutory provision. It's just kind of a question of what it means, at least in my view, and whether the regulation is consistent with it. And it says, you know, let's say a tribe or a person who relates to a group that's indigenous to the United States. Yes. Now, if Kennewick Man was living in the United States and wasn't on a tour from Europe or Asia, it just happened, or Polynesia, but let's say lived here and had ancestors who lived for a number of generations in the United States. Does that mean that he's Native American because he's indigenous? Is there any time limit? And, of course, the magistrate judge thought it had to be a relation to a tribe that is existing today, right? There are two issues that come up from that, yes, sir. And I think the way that the statute commands that to be viewed is as follows. The first thing that has to happen is we need to find this relationship. So in the example that you posed, which is that Kennewick Man has been here, has been living in the United States, and for some generations back, and we have evidence of that, then if we conclude that that's what indigenous means, and it may very well be what we would originally presume. I'm sure you need evidence of that. You might presume that. Well, I don't know that we can presume that. Well, if he was found in Kennewick on the Columbia River, it probably wasn't so easy to travel 9,000 years ago. Actually, the evidence in the record was that at that period of time, during that phase, there were some 20 national bands that had groups of from 75 to 150 people, and they traveled enormous distances because they were hunter-gatherers. But they were pretty much in a range, though, weren't they, like in North America? Well, they can be. They weren't bopping over from Hong Kong or something. Well, they were coming from a number of places, or could have come from another number of places, one of them being Canada, which is a border that is only about 300 miles away. Okay, so Native American wouldn't apply to North America outside of the United States. Well, the statute says indigenous to the United States, and even interiors definitions talk about the land that comprises the United States now. So once you cross that international border, which is only some 300 miles away, you have something which by definition cannot be Native American. The second thing that the definition uses is is indigenous to the United States, and the magistrate judge spent quite some time in his opinion focusing on Congress's choice of the present tense, the use of the word is. Now, under statutory construction and the cases that look at verb tense, we at least draw the principle that the tense of the verb used by Congress is a choice, a conscious choice that Congress makes, and there are very, very few cases which reject outright that looking at the verb tense is possible. Let me examine that. I have a little trouble with the government's position and the tribe's position because of the remote antiquity of the remains, but I have a little trouble with the magistrate judge's position on the present tense of is as well, so I just want to test the limits of it. If a tribe currently existing dissolved itself for some reason, I assume that can happen, right? A tribe can cease to be a tribe for some reason. I believe the legal standard would be if the Secretary of Interior removes them from the list, there's a list that's published annually. All right. Let's say then they had burial sites, but they're no longer a recognized tribe. Their remains in their sites would still be under NAGPRA, wouldn't they, even though it says a group that is indigenous, or would it not be? In other words, if a tribe that's here now is not here 10 years from now, are their grave sites fair game under the magistrate judge's ruling? I don't believe they would be given the scope of the definition, and I think Congress wrote words whether or not they were thinking about that particular problem, but their words certainly can be extended to that because the definition is a tribe, people, or culture that is indigenous. So if you were to have an indigenous culture, then you can have something from that, be a Native American, even if the tribe is disbanded or delisted. So those remains would still be repatriated in your view? I don't believe they could be repatriated as culturally affiliated because, as you commented earlier. Unless there were lenient sentence. Right. Because the cultural affiliation requires a present-day tribe. Could they be under the Section 3B procedure? Well, they could be under that. They could be unclaimed remains. They could be lineal. What about like the Arizona cliff-dwelling Indians that I guess are not there now? An extinct tribe. Right. A tribe that maybe was in North America, you know, at 400 A.D. or 1,000 A.D. but just isn't around now. We have two things that help us analyze that issue. The first is Congress's comments, at least in the debate, about caring for the people who are extinct. And second, if they are extinct, we'd suggest that the magistrate judge was correct in saying that given the way Congress wrote this definition, we have difficulty believing that that can be Native American as NAGPRA applies. Now, that doesn't mean that it's not covered by a protective statute. It would certainly be covered by either the Antiquities Act or the Archaeological Resources Protection Act. Both of those could and would cover that kind of situation. But for something that was here but is now extinct, the text and the context of the Native American definition suggests that that is not Native American as this narrower statute conceives of that particular situation and of what is a Native American under that statute. And that would be so because of Congress's use of the word is indigenous, but also for a couple of other reasons. You'll note that in Native American, Congress used the phrase indigenous to the United States. Now, the United States is a political creature that did not exist until the 18th century. In contrast, if we look back at the Native Hawaiian definition, Native Hawaiian is an individual who is a descendant of the aboriginal people who prior to 1778 occupied and exercised sovereignty in the area that now constitutes the state of Hawaii. Congress uses two things in that definition that are absent in Native American. They use a calendar date, which they elected not to use in defining Native American, and they use this area that now constitutes the state of Hawaii. That's what Interior borrowed later on when they changed the definition. They didn't do that in Native American, which strongly suggests and supports that the magistrate judge was reading this correctly. Indigenous to the United States means that it is indigenous to the United States. It has a temporal quality to it, and that temporal quality is the present. Could you at some point in your argument address the remedy issue? If we decide that the remains are not Native American and we are going to affirm in that respect, still, was the magistrate judge right to order testing rather than remand? I think that ordering. In answering that, explain how, in your view of the case, the problem would be dealt with if scientists did more testing. Yes, okay. And the testing did show a biological relationship to existing tribes. A couple of things. One, I think that it is a misstatement on the part of both the tribes' briefing and the government's briefing to state that the judge ordered study and testing. What he said was, this skeleton is not covered by NADFA. Therefore, this skeleton is covered by ARPA. He also found, based on evidence in the record, that under the normal course of affairs, the plaintiffs, eminent scholars, would have been given some level of permission, and he therefore ordered the plaintiffs to be treated as they would have otherwise been treated under ARPA and be given access to study subject to the terms and restrictions that would otherwise apply. Now, basically what that was saying to the Department of Interior was, you were wrong in putting it under this statute. You must give them the access that they would normally have under ARPA, the Archaeological Resources Protection Act. And that statute commands that remains of this nature, of this scientific value, are to be taken care of for the education and the understanding and the scholarship of the people of the United States as a whole. In many cases, that mandates study.  But Interior remains the curator of the remains and can impose certain restrictions on those. I would foresee that inevitably there would be endless argument about what studies would be appropriate, but I would also suggest that most of, in many of the studies, perhaps most of them posed by the plaintiffs, do not involve any damage or any consumption of the remains. Many of them are measurements and review and photographing which don't harm them. And that is consistent in this record with what would normally be accorded to these plaintiffs. So that's the first question. The second question is, how would it be handled procedurally? Well, let me just clarify something. The problem that I'm concerned about wouldn't arise if we adopted the view of the magistrate judge that the remains have to be tied to an existing tribe. That is, means is in the literal sense. But if we held, if we rejected that and said that they could be a past tribe, an extinct tribe or some other tribe that wasn't currently existing, but still these remains are too ancient and there hasn't been enough of a biological or any kind of relationship shown with present peoples. So let's say we said on that basis the repatriation was not right and interior erred. But then the scientists do more testing and the testing reveals a relationship that isn't now known. What's the procedural approaches that would be then available? I believe that the procedural approach, and that is actually not at all a far-fetched example because as this record contains, that precise issue happened in Jamestown when Dr. Owsley just evaluated some remains and found they were not Indian, but they were the first African-American slaves to reach this shore. Probably about 1619. Actually predated that a little bit. So a very important piece of history. That could happen. We don't believe that it will in this case, given what we know about this skeleton. But assuming that it would happen, then I would suggest that the procedure that would follow would be that once there was evidence suggesting that these remains were in fact Native American, as defined by the statute, we return them to NAGPRA. There becomes an invitation, there is an invitation then for claimants to appear and make a further claim for the remains now that we know that they are Native American. And we resume the process. And the process would look once again for whether there was sufficient evidence for cultural affiliation or the alternative would be failing that, then they would be disposed of as unclaimed remains, remains which could not be repatriated. So does the process, if that's true, have to proceed under the Department of Interior's authority? Well, I believe it would because that is the responsible agency for the skeleton if that were to happen. So that if the study were to establish that we have a Native American skeleton, despite what everybody thinks now, perhaps they would go in and do those DNA studies that failed rather miserably the first time around and perhaps they find sufficient evidence of a DNA relationship which does show that it's Native American. Then there would be an additional process of claiming and an additional process of gathering evidence and making a determination. Because NAGPRA does not have a sense of finality in the government's decisions. In this particular case, it did because of the way they decided it. But there is also, in the scientific community, an understanding that new methods of evaluation may give us new information going forward. As I said, once again, we do not believe that under any circumstances that will occur given what's known about the skeleton used in the government's reports. It has no relationship to anything that exists on Earth today except for the handful of skeletons that have been found like it. But I would believe and I would suggest that that would be the way that that would be handled in an eventuality. Thank you, Counsel. I'm going to, because of the importance of the issues, give about three minutes for rebuttal. I know you exceeded your time earlier. Thank you, Your Honor. I'd like to make several quick points. First of all, in the sort of the scheme of what could Congress have been thinking here in terms of ancient remains, I think it's important, again, to go back to the way the act is structured. The threshold determination simply gets you into procedural protections for the tribe. Congress was trying to give, in order to facilitate tribes' repatriation of related remains to which they have affinity, providing some procedural protections which really aren't there under ARPA. And the simplest way I can say it, they were trying to give the tribes a seat at the table. And if you cut them off at the outside, they don't even get into the room. In terms of saying Congress didn't intend to assign interior policy decisions, I think it's pretty obvious that interior administers the statute, was given rulemaking authority. And I'd really point to Section 3B because that's where Congress put the policy decision about these kinds of remains right in the hands of interior. And that Congress didn't choose to try to resolve all these very serious concerns from all parties by legislating it. It said, OK, interior, you consult with all these groups, and you figure out what kind of study should go on for these remains that we cannot identify culturally. Finally, in terms of Congress was also aware of the inherent proof problems when you get into these older remains, historic or even prehistoric remains. And Congress was not trying to erect barriers to the governing of the statute by putting scientific certainty of having to prove a relationship back to these ancient remains. Another way I might express it, Congress was trying to help Indian tribes in the statute. And Congress may not, or I should say this court or athletes, may not believe that the tribes have been in the Kennewick Man area for, you know, nine or ten thousand years. But the tribes believe that. And so you're trying to start. Is that in the record, by the way? Is that in the record that all the tribes believe that? I read in the record some statements by some persons that they believe that their ancestors had lived on these lands since the beginning of time. But I didn't read anything indicating that that was like a formal position of all the tribes. I think I extrapolated from the fact that they still assert and still, and I think have reason to, that they are culturally affiliated and therefore those population groups that were there at that time are related to them. So that's where I made that extrapolation. I didn't, I'm not trying to suggest there's a place in the record where they said it exactly how I did. And I think in going back to the ambiguity, I mean, one of the problems with the magistrate judge here, if there's ambiguity in the statute, he accorded absolutely no deference. And there may be a sliding scale here, but it's a really extreme position to say no deference to interior in this case. And he also said there's no deference under the Indian canon of construction because he didn't regard this as there being any ambiguities. And again, both of those, in this particular case, you don't have to choose between Chevron or the Indian canon because they both lead you to the same place. Thank you, Counsel. The case just heard you to submit it, and I'd like to thank all the lawyers and parties involved for obviously a lot of hard work and some very interesting briefing and very helpful arguments. And that goes for the amicus briefs, too. We have examined all of them, and we'll take them all into account. And with that, we return for this session. All rise.
judges: Aldisert , Graber, Gould